IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PATRICIA BOOTH | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 13-5968 |
| BMO HARRIS BANK, N.A., ET AL. | : | |

**SURRICK, J.**                                                                                                         **AUGUST 11 , 2014**

<u>MEMORANDUM</u>

   Presently before the Court is Defendant First International Bank & Trust's Motion to Compel Arbitration (ECF No. 34), Defendant BMO Harris Bank, N.A.'s Motion to Compel Arbitration (ECF No. 40), and Defendant North American Banking Company's Motion to Compel Arbitration (ECF No. 46). For the following reasons, Defendants' Motions will be granted.

**I.     BACKGROUND**

   Plaintiff allegedly obtained three "payday" loans at usurious rates from three online lenders. (*See* Compl., ECF No. 1.) A payday loan is a small, high fee, short-term loan traditionally made to consumers in anticipation of an upcoming paycheck. (*Id.* at ¶ 23.) In this case, the payday loans had interest rates of 30%. (*Id.* at ¶¶ 79, 83.) To obtain a payday loan, a borrower must provide the lender with security for the loan amount by giving the lender a personal check or authorizing the lender to electronically debit the borrower's account. (*Id.*) On May 30, 2013, Plaintiff obtained a payday loan from One Click Cash by completing an online application. (*Id.* at ¶ 82.) As part of the transaction, Plaintiff authorized One Click Cash to debit her checking account with Wells Fargo to repay the loan. (*Id.*) One Click Cash initiated a debit transaction on July 5, 2013. (*Id.* at ¶ 85.) Plaintiff obtained a second payday loan on July 10,

2013, this time from a different online lender, My Cash Advance, and she again authorized the lender to debit her checking account. (*Id.* at ¶ 78.) My Cash Advance debited Plaintiff's checking account on July 19, 2013. (*Id.* at ¶ 81.) Finally, on July 24, 2013, Plaintiff obtained a third payday loan from a third lender, Plain Green. (*Id.* at ¶ 74.) Plaintiff authorized Plain Green to debit her checking account, and Plain Green initiated a debit transaction on August 2, 2013. (*Id.* at ¶ 77.)

To electronically deposit the loan proceeds and then to initiate the debit transactions of Plaintiff's checking account for repayments, One Click Cash, My Cash Advance, and Plain Green (collectively the "Lenders") needed access to the Automated Clearing House ("ACH") Network. (*Id.* at ¶ 6-7.)[1] The Defendants here are Originating Depository Financial Institutes ("ODFIs") that are members of and have access to the ACH Network. (Compl. at ¶ 6.) For a fee, Defendants allegedly provided the Lenders with the access they needed to the ACH Network by "originating" the debits and credits on the payday loans. (*Id.*) Specifically, First International Bank & Trust ("FIB") originated transactions in connection with the May 30 loan from One Click Cash; BMO Harris Bank, N.A. ("BMO") originated transactions in connection with the July 10 loan from My Cash Advance; and North American Banking Company ("NABC") originated transactions in connection with the July 24 loan from Plain Green. (*Id.* at ¶¶ 77, 81, 85.) Plaintiff claims that by providing the Lenders access to the ACH Network, Defendants violated the Racketeering Influenced and Corrupt Organization Act ("RICO") by knowingly participating in an enterprise's affairs through "collection of unlawful debt." Defendants allegedly knew that the Lenders were loaning at usurious rates but still allowed them to access

---

[1] The ACH Network is a processing system in which financial institutions accumulate ACH transactions throughout the day for later batch processing. The ACH transactions are the credits and debits of funds from a financial account necessary for an exchange between two parties. (Compl. ¶ 31.)

the ACH Network. In addition, Plaintiff alleges that Defendants each conspired with the Lenders to violate RICO. Lastly, Plaintiff claims that each Defendant violated various Pennsylvania state laws.

When Plaintiff obtained each of her payday loans, she signed loan agreements with the Lender that provided the loan (collectively "Loan Agreements").[2] All the Loan Agreements contain arbitration provisions. First, the loan application and loan agreement with One Click Cash contains the following arbitration provision:

> "We" or "Us" are SFS, Inc. dba OneClickCash and its directors, officers, employees, authorized representatives, agents and successors in interest acting within the scope of their authority.
> . . . .
> If any dispute arises that We cannot resolve to your satisfaction, You and We hereby agree that we shall arbitrate that dispute in accordance with the terms of this Arbitration Provision.
> . . . .
> The word "dispute" and "disputes" are given the broadest possible meaning and include, without limitation and whether past, present or future: (a) all claims, disputes or controversies arising from or relating directly or indirectly to the signing of this Loan Agreement, <u>including the validity and scope of this Arbitration Provision</u>, or any claim, dispute, or controversy relating to the interpretation, applicability, enforceability or formation of this Loan Agreement, including, but not limited to any claim that all or any part of this Loan Agreement or this Arbitration Provision is void, voidable, invalid or unenforceable; (b) all federal or state law claims arising from or relating directly or indirectly to this Loan agreement . . . ; (c) all counterclaims, cross-claims and third party claims; (d) all common law claims, based upon contract, tort, fraud, or other intentional torts; (e) all claims based upon a violation of any state or federal constitution, statute or regulation . . .; (g) all claims asserted by You individually against Us,

---

[2] Although Plaintiff did not attach the Loan Agreements to the Complaint, Defendants provided them as exhibits attached to declarations that were made by individuals who had access to the Lender's records of customer loan agreements. We can consider these documents at this stage because they are integral to and explicitly relied upon in the Complaint: Plaintiff references the terms of the Loan Agreements throughout the Complaint and cites to Defendants' exhibits throughout her oppositions. *In re: Burlington Coat Factory Securities Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (stating documents that are integral to or explicitly relied upon in the complaint may be considered on a motion to dismiss without converting the motion into one for summary judgment). In addition, Plaintiff does not challenge the "validity and scope" of the arbitration provisions in the Loan Agreements. (Pl.'s FIB Resp.5-6; Pl.'s BMO Resp. 5; Pl.'s NABC Resp. 5)

3

> and/or any of our <u>agents, consultants, or servicers and/or any of their employees, directors, officers, shareholders, managers, members, parents, subsidiaries, or any affiliated entities (hereinafter collectively referred to as "related third parties")</u> . . .

(One Click Cash Agmt., Lin Decl. Ex. 1A, ECF No. 35 (emphasis added).)  FIB originated the transactions related to the One Click Cash Loan Agreement.  Next, the loan agreement with My Cash Advance similarly reads:

> [T]he words "dispute and "disputes" are given the broadest possible meaning and include without limitations (a) all claims, disputes, or controversies arising from or relating directly or indirectly to the signing of this Arbitration Provision, <u>the validity and scope of this Arbitration Provision</u> and any claim or attempt to set aside this Arbitration Provision; (b) all federal or state law claims, disputes or controversies, arising from or relating directly or indirectly to the Loan Agreement . . . (c) all counterclaims, cross-claims and third-party claims; (d) all common law claims, based upon contract, tort, fraud, or other intentional torts; . . . (g) all claims asserted by You individually against Us and/or any of Our <u>employees, agents, directors, officers, shareholders, governors, managers, members, parents company or affiliated entities (hereinafter collectively referred to as "related third parties")</u> . . . (emphasis added)
> . . . .
> YOU AND WE WOULD HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE DISPUTES THROUGH A COURT AND HAVE A JUDGE OR JURY DECIDE THE DISPUTES BUT HAVE AGREED INSTEAD TO RESOLVE DISPUTES THROUGH BINDING ARBITRATION.  (emphasis in original)

(My Cash Advance Agmt., Raines Decl. Ex. 5, ECF No. 41.)  BMO originated the transactions related to the My Cash Advance Agreement.  Finally, the loan agreement with Plain Green reads:

> You and we . . . agree that any Dispute . . . will be resolved by Arbitration.
> . . . .
> [T]he terms "we," "our," and "us" mean Lender, Lender's affiliated companies, the Tribe, <u>Lender's servicing and collection representatives and agents, and each of their respective agents, representatives, employees, officers, directors, members, managers, attorney, successors, predecessors, and assigns</u>.
> . . . .
> [T]he term Dispute is to be given its broadest possible meaning and includes, without limitation, all claims or demands (whether past, present, or future) . . . based on any legal or equitable theory (contract, tort, or otherwise) and regardless of the type of relief sought . . . .  A Dispute includes by way of example and without limitation, any claim based upon tribal, federal or state constitution, statute, ordinance, regulation, or common law, and <u>any issue concerning the</u>

4

> validity, enforceability, or scope of this Agreement or this Agreement to Arbitrate.

(Plain Green Agmt., Schwingler Decl. Ex. 1, ECF No. 46 (emphasis added).) NABC originated the transactions related to the Plain Green Agreement.

Defendants have each filed a Motion to Compel Arbitration under the above arbitration provisions. FIB's Motion was filed on December 11, 2013 (FIB's Mot., ECF No. 34), BMO's Motion was filed on December 13, 2013 (BMO's Mot., ECF No. 40), and NABC's Motion was filed on December 24, 2013 (NABC's Mot., ECF No. 46). Plaintiff responded to FIB's Motion on January 21, 2014 (Pl.'s Resp. FIB, ECF No. 50) and to BMO's Motion and NABC's Motion on January 30, 2014 (Pl.'s Resp. BMO, ECF No. 53; Pl.'s Resp. NABC, ECF No. 54). On February 2, 2014, FIB filed a Reply. (FIB's Reply, ECF No. 56.) On February 20, 2014, BMO and NABC also filed Replies. (BMO Reply, ECF No. 62; NABC's Reply, ECF No. 58.) The parties have continued to file notices of supplemental authority.

## II.   LEGAL STANDARD

The applicable legal standard for a motion to compel arbitration depends upon the facts and circumstances of the case. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013*)*. "[W]hen it is apparent, based on the face of a complaint, and documents relied upon in the complaint, that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay." *Id.*; *Somerset Consulting, LLC v. United Capital Lenders*, *LLC*, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011). Here, the Loan Applications indicate that Plaintiff agreed to arbitrate disputes with the Lenders. Plaintiff does not contest the validity of the arbitration provisions in the Loan Applications. Rather, she claims that Defendants cannot enforce the arbitration provisions. The Rule 12(b)(6) standard is appropriate.

Under this standard, the District Court must "accept all factual allegations in the complaint as true and give the pleader the benefit of all reasonable inferences that can be fairly drawn therefrom." Fed. R. Civ. P. 12(b)(6). The court cannot accept conclusory allegations. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). Viewing the facts in this light, a motion to compel arbitration will be granted "only where there is no genuine issue of fact concerning the formation of the agreement to arbitrate." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 159 (3d Cir. 2009) (internal quotation marks omitted).

### III.   DISCUSSION

Pursuant to the Federal Arbitration Act ("FAA"), arbitration clauses in contracts that involve commerce are "valid, irrevocable, and enforceable, save upon such grounds that exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  This establishes a strong federal policy favoring arbitration. *Moses H. Cone Mem'l Hosp. v. Mercy Constr. Corp*, 460 U.S. 1, 24 (1983).  However, a dispute is not automatically submitted to arbitration upon the demand of a party to the dispute. *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 523 (3d Cir. 2009).  First, a court must determine that there is an agreement to arbitrate. *Id.*  "Because an arbitrator's authority derives solely from the parties' agreement to submit their disputes to arbitration, a party cannot be compelled to submit a dispute to arbitration unless it has agreed to do so." *Invista S.a.r.l. v. Rhodia, S.A.*, 625 F.3d 75, 84 (3d Cir. 2010) (quotation omitted); *see also Guidotti*, 716 F.3d at 771.

Here, Plaintiff did not contract with Defendants but with the Lenders who are not parties to this action.  However, this does not mean Defendants cannot enforce the arbitration provisions in the Loan Agreements because "non-signatories may be bound to arbitration agreements under certain very limited circumstances." *Rhodia*, 625 F.3d at 84.  There are five theories upon which

6

non-signatories can be bound:  (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel.  *Id.*  Defendants argue that agency and estoppel are applicable to this case.  In addition, Defendants argue that they can enforce the arbitration provisions as third-party beneficiaries to the Loan Agreements.  Plaintiff responds that the arbitration provisions should not be enforced because the Loan Agreements are illegal and Defendants have unclean hands.[3]

    A.        **Equitable Estoppel**[4]

---

[3] FIB and NABC argue that based on the language of the Loan Agreements, the issue of arbitrability should be decided by an arbitrator.  "The Court will not assume that a party has agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that it did so."  *Sarl v. A.M. Todd Co.*, No. 07-2727, 2009 WL 2526432, at *4 (E.D. Pa. Aug. 18, 2009) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-84 (2002)).  Here,  there is no agreement between Plaintiff and Defendants, and Defendants as "non-signator[ies] cannot be bound to arbitrate unless [they are] bound under traditional principles of contract and agency law to be akin to a signatory of the underlying agreement."  *Rhodia*, 625 F.3d at 84.  Therefore, even if the issue of arbitrability must be submitted to the arbitrator under the language of the Loan Agreements, we still must first determine whether Defendants are bound by and can enforce the arbitration provisions.  *See Aluminium Bahrain B.S.C. v. Dahdaleh*, -- F. Supp. 2d --, No. 8-299, 2014 WL 1681494, at *8 (W.D. Pa. Apr. 28, 2014) (determining whether non-signatory could enforce arbitration agreement before determining whether the parties agreed to arbitrate arbitrability).

[4] Plaintiff claims that under *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009), "[a] non-signatory to an arbitration agreement can only compel parties to arbitrate under the FAA when 'the relevant state contract law allows him to enforce the agreement.'"  (Pl.'s Resp. FIB 19; Pl.'s Resp. BMO 15; Pl.'s Resp. NABC 16 (all quoting *Arthur Andersen*, 556 U.S. at 632).)  Plaintiff claims that the relevant contract law here is the law of the tribal nations where the Lenders are based, as set out in the choice of law provisions of the Loan Agreements.  Yet, Plaintiff does not claim there is a conflict between Pennsylvania law and the applicable tribal law.  Instead, she argues that Defendants' estoppel argument fails because Defendants have not established whether estoppel is available under the applicable tribal law.  Plaintiff's argument is misguided.  The choice-of-law question is relevant only to the extent that the foreign law conflicts with the law of the forum.  *Berg Chilling Sys., v. Hall Corp.*, 435 F.3d 455, 462 (3d Cir. 2006) ("According to conflicts of laws principles, where the laws of the two jurisdictions would produce the same result on the particular issue presented, there is a 'false conflict,' and the Court should avoid the choice-of-law question." (citations omitted)).  And when foreign law is at issue, "it is incumbent upon the parties to carry both the burden of raising the issue that foreign law may apply in an action, and the burden of adequately proving foreign law to enable the court to apply it in a particular case."  *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 469 (E.D. Pa. 2010)

There are two theories of equitable estoppel that can bind a non-signatory to an arbitration clause. *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 199 (3d Cir. 2001). First, "[e]stoppel can bind a non-signatory to an arbitration clause when that non-signatory has reaped the benefits of a contract containing an arbitration clause." *Rhodia*, 625 F.3d at 85. The purpose of this is to "prevent a non-signatory from embracing a contract, and then turning its back on the portions of the contract, such as an arbitration clause, that it finds distasteful." *Peltz ex rel. Estate of Peltz v. Sears Roe Buck*, 367 F. Supp. 2d 711, 719 (E.D. Pa. 2005). Second, equitable estoppel applies to bind a signatory to arbitrate with a non-signatory at the nonsignatory's insistence when there is: (1) a "close relationship between the entities involved[;]" and (2) "[a] relationship [between] the alleged wrongs [and] the nonsignatory's obligations and duties in the contract[.]" *E.I. DuPont de Nemours & Co.*, 269 F.3d at 199. "To satisfy the second part of the test, the non-signatory seeking enforcement of an arbitration agreement must show that the claims against them are 'intimately founded in and intertwined with' the underlying obligations of the contract to which

---

(citing *Bel-Ray Co., Inc. v. Chemrite Ltd.*, 181 F.3d 435, 440 (3d Cir. 1999)). When the parties do not satisfy these burdens, the law of the forum applies. *Id.*; *see also Walter v. Neth. Mead N.V.*, 514 F.2d 1130, 1137 n.14 (3d Cir. 1975) (concluding that although the law of the Netherlands ostensibly applied, where a party did not conclusively establish the foreign law, the court should assume it is consistent with the law of the forum). Plaintiff has not alleged that any true conflict exists, and according to FIB and NACB, no conflict does exist because the applicable tribal law allows estoppel. In addition, FIB and BMO state that the FAA—not tribal law—applies to the arbitration provisions in the One Click Cash and My Cash Advance Loan Agreements. It is clear that the parties have not carried their burden of proving the tribal law such that we can apply here. We therefore will apply Pennsylvania law to the extent that it, and not the FAA, is applicable.
    We note that this outcome is consistent with the parties' submissions to this Court. Although Plaintiff appears to be making a choice-of-law argument, all of Plaintiff's claims and arguments in opposition to Defendants' Motions other than the choice-of-law argument assume that Pennsylvania law applies. Defendants also agreed to the application of Pennsylvania law. Thus, it appears that the parties have agreed that Pennsylvania law applies. We will not disturb that agreement. *See USA Mach. Corp. v. CSC, Ltd.*, 184 F.3d 257, 263 (3d Cir. 1999) (assuming without deciding that Pennsylvania law governed diversity suit where parties agreed on choice of law).

they were not a party.  *Miron v. BDO Seidman, LLP*, 342 F. Supp. 2d 324, 333 (E.D. Pa. 2004) (quoting *E.I. DuPont de Nemours & Co.*, 269 F.3d at 199).  The second theory of equitable estoppel applies to this case.

### 1. Close Relationship Between the Entities

Determining whether a close relationship exists between the entities involved requires "examin[ing] the relationship of the alleged wrong to the nonsignatory's obligations and duties in the contract."  *Miron*, 342 F. Supp. 2d at 333 (internal citations omitted).  "[N]on-signatories . . . can enforce an [arbitration] agreement when there is an obvious and close nexus between non-signatories and the contract or the contract parties" such that it "is the signing parties' intent" to hold that party to the arbitration provision.  *Dodds v. Pulte Home Corp.*, 909 A.2d 348, 351 (Pa. Super. Ct. 2006).  Here, a close relationship exists between Defendants, the parties to the Loan Agreements, and the Loan Agreements themselves because Defendants' role in processing the debits and credits related to Plaintiff's loans was set out in the Loan Agreements, and Plaintiff agreed to arbitrate disputes with parties other than the Lender.

In both the One Click Cash and Plain Green Agreements, Plaintiff agreed to provisions authorizing the Lender's "agents" or other listed types of third-parties to debit Plaintiff's bank account through the ACH Network for re-payment of her loans.  The One Click Cash Agreement listed "authorized representatives," and the Plain Green Agreement listed "representatives" and "affiliates."  The language of the Loan Agreements reveals that Plaintiff also consented to arbitrate with not only the signatory Lenders, but also related parties.  Specifically, under the One Click Cash Loan Agreement, Plaintiff agreed to arbitrate all claims against One Click Cash's "agents," "servicers," or "affiliated entities." (One Click Cash Agmt.)  Similarly, Plaintiff agreed to arbitrate any dispute with Plain Green's "servicing and collection

9

representatives and agents" under the Plain Green Loan Agreement. (Plain Green Agmt.) Having agreed to arbitrate with undefined agents and servicers or servicing representatives, and likewise having agreed that agents and third-parties, such as representatives, could perform the ACH transactions related to the Loan Agreements, it would be inequitable for Plaintiff to avoid arbitration with those same agents and third-parties that obviously have a nexus to Plaintiff and the Loan Agreements. FIB and NABC originated the ACH transactions that were referenced and anticipated by the Loan Agreements, which were integral to the functioning of the loan. Therefore, FIB and NABC are closely related to the entities involved such that the parties intended for claims against them to fall within the scope of the arbitration provisions. Indeed, other courts on similar facts have found a sufficiently close relationship to compel arbitration under an estoppel theory. *See Riley v. BMO Harris Bank, N.A.*, No. 13-1677, 2014 WL 3725341, at *6 (D.D.C. July 29, 2014); *Graham v. BMO Harris Bank, N.A.*, No. 13-1460 (D. Conn. July 16, 2014); *Moss v. BMO Harris Bank, N.A.*, No. 13-5438, 2014 WL 2565824, at *5-6 (E.D.N.Y. June 9, 2014). In each of these cases, banks that processed ACH transactions for payday lenders were found to be intimately connected to the signatory plaintiffs who entered into broad arbitration agreements with the payday lenders. The signatory plaintiffs were not permitted to deny the foreseeability of having to arbitrate with the banks.

The same result is warranted with regard to BMO. The My Cash Advance Loan Agreement contains an ACH Authorization whereby Plaintiff authorized My Cash Advance and any "assignee" to initiate electronic fund transfers from Plaintiff's account. The ACH Authorization also refers to the "network." While this is a narrower ACH authorization than the other Loan Agreements, the authorization still suggests that the debit could be performed by a third party. In addition, the My Cash Advance Loan Agreement contains a broad arbitration

provision, providing for arbitration of disputes asserted against "agents" of My Cash Advance or "affiliated entities." (My Cash Advance Agmt.) The combined effect of these provisions again creates an obvious close nexus between BMO and the parties to the Loan Agreement, such that the parties intended to hold BMO to the arbitration agreement. BMO originated the ACH debits anticipated in the Loan Agreement, and the parties to the Loan Agreement—by agreeing to arbitrate with affiliated entities—agreed to arbitrate with an undefined, expansive class of entities conducting business with My Cash Advance. Defendants have established that a close relationship exists. They should be permitted to enforce the arbitration provisions in the Loan Agreements.

2. *Claims Intertwined with Contract Obligations*

Claims are intertwined with an arbitration agreement when the signatory's claims "rely on the terms of the agreement or assume the existence of, arise out of, or relate directly to, the written agreement." *Sarl v. A.M. Todd Co.*, No. 07-2727, 2008 WL 724607, *9 (E.D. Pa. Mar. 18, 2008). Here, all of Plaintiff's claims rely on the terms of the Loan Agreements being illegal because of allegedly usurious interest rates. Each claim is premised on the idea that Defendants, by giving the Lenders access to the ACH Network to originate debits and credits related to the Loan Agreements, were involved in the collection of unlawful debts. Thus, the natural conclusion is that Plaintiff's claims are intertwined with the Loan Agreements that contain both the usurious interest rates and the arbitration provisions. *Bannett v. Hankin*, 331 F. Supp. 2d 354, 360 (E.D. Pa. 2004) (finding the defendants had standing to compel arbitration "[b]ecause all of [the] [p]laintiff's claims make reference to or presume the existence of the partnership agreements and relate directly to those agreements"); *see also Sarl*, 2008 WL 724607, at *9-10

(E.D. Pa. Mar. 18, 2008) (finding that the plaintiffs were estopped from avoiding arbitration because claim that non-signatory breached the contract relied upon the contract).

Plaintiff argues that her claims are not "intertwined" with the Loan Agreements because she has not alleged that Defendants violated duties or obligations under the Loan Agreement. Plaintiff's argument is misguided. The relevant question is whether the claims at issue rely or depend on the terms of the agreement. *Bannett*, 331 F. Supp. 2d at 360; *Miron*, 342 F. Supp. 2d at 333 ("The plaintiff's *actual dependence* on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the sine qua non of an appropriate situation for applying equitable estoppel." (emphasis in original) (quotations omitted)). Contrary to Plaintiff's assertion, her claims do actually depend on the Loan Agreements: her statutory and common law claims specifically rely on the terms of the Loan Agreements being illegal.

Further evidence of this dependence is found in Plaintiff's allegations of concerted misconduct between Defendants and the Lenders. *See Sarl*, 2008 WL 724607, at *10 (quoting *Grigson v. Creative Artist Agency L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000) ("Estoppel may also apply where the nonsignatory is alleged to have engaged in 'substantially interdependent and concerted misconduct' with a signatory other than the plaintiff.")). Plaintiff alleges interdependent and concerted conduct by Defendants and the Lenders through the use of their roles in the ACH Network "to facilitate payday loans." (*See* Compl. ¶¶ 107, 124, 141.) More importantly, the Loan Agreements were central to the goal of the alleged conspiracy: without the Loan Agreements, Defendants would not have loans to facilitate. Because Plaintiff's entire case depends on the contents of the loan agreements, which Defendants allegedly knew about, we find that the claims are sufficiently intertwined with the Loan Agreements.[5] Consequently, Plaintiffs

---

[5] As noted above, courts in other jurisdictions facing nearly identical facts to those before us have found the plaintiffs to be equitably estopped from denying similar arbitration provisions.

are equitably estopped from disclaiming Defendants' right to enforce the arbitration provisions in the Loan Agreements.[6]

### B. Legality of the Loan Agreements and Unclean Hands

Plaintiff also argues that the Court should not enforce the arbitration provisions because they are contained within allegedly illegal Loan Agreements. Plaintiff fails to recognize that we do not have authority to decide that issue. Plaintiff's argument attacks the legality of the entire Loan Agreement—not the individual arbitration provisions. The Supreme Court established in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-446 (2006), that "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." Accordingly, we will leave the determination of the legality of the Loan Agreements to the arbitrator.[7]

Plaintiff's argument that Defendants have unclean hands fails for a similar reason. Plaintiff contends that Defendants aided and abetted the illegal Loan Agreements, and thus they have unclean hands and should not be permitted to benefit from the doctrine of equitable estoppel. Again, Plaintiff is not specifically attacking the arbitration provision, but Defendants actions with regard to the Loan Agreement as a whole. This is again an issue for the arbitrator

---

Those courts found the loan agreements to be intertwined with the plaintiffs' claims. Those cases are persuasive. *Riley*, 2014 WL 3725341, at *5; *Graham v. BMO Harris Bank, N.A.*, No. 13-1460 (D. Conn. July 16, 2014); *Moss*, 2014 WL 2562824, at * 5-6; *Elder v. BMO Harris Bank, N.A.*, No. 13-3043, 2014 WL 1429334, at *1 (D. Md. Apr. 11, 2014).

[6] Because we found that equitable estoppel applies, we need not determine whether Defendants are third-party beneficiaries of the Loan Agreements or agents of the Lenders.

[7] Plaintiff attempts to claim that she is challenging the validity of the arbitration provisions by alleging that the arbitration provisions are linked to illegal ACH Authorizations. In essence, Plaintiff contends that before we can compel arbitration, we must determine whether the ACH Authorizations were illegal, and thus whether there is a possibility the arbitration agreements were also illegal because of their relation to the ACH Authorizations. We reject this argument. Plaintiff has not identified any facts that suggest the ACH Authorizations were illegal.

13

because any challenge to the validity of the entire contract must go to the arbitrator. *In re A2P SMS Antitrust Litig.*, 972 F. Supp. 2d 465, 482 (S.D.N.Y. 2013) (stating that "in contesting the application of equitable estoppel, Plaintiffs still must discuss why Defendants' hands are unclean with regard to the 'making of the agreement to arbitrate'" (quoting *Buckeye*, 546 U.S. at 446)). As such, Plaintiff's arguments concerning the legality of the Loan Agreements and Defendants' alleged unclean hands do not affect Defendants' ability to enforce the arbitration provisions.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motions to Compel Arbitration will be granted. In addition, Plaintiff's claims will be dismissed because all the claims in the Complaint are subject to arbitration as provided in the Loan Agreements. *Seus v. John Nuveen & Co., Inc.*, 146 F.3d 175, 179 (3d Cir. 1998) ("If all the claims involved in an action are arbitrable, a court may dismiss the action instead of staying it.").

An appropriate Order follows.

BY THE COURT:

_____
**R. BARCLAY SURRICK, J.**
